Okay, our next case this morning is number 162637, Guangdong, Dongyang, Kitchenware versus United States, Ms. Salzman. Thank you. May it please the court. This appeal involves the surrogate values relied upon by the Department of Commerce to determine the fair value of stainless steel sinks from China. Specifically, appellate contests that the department double-counted labor in its application of its surrogate labor methodology. I don't understand why people refer to this as double counting. I mean, I had a really hard time understanding the briefs on this issue which I think are not the clearest briefs I've ever read. I spent quite a bit of time trying to understand it. As I understand the theory, it's because you're arguing that because the MSO labor rate was too high as a result of including SG&A hours in there, that the SG&A hours should be deleted from the I don't understand why that's called double counting, but that's another question. It derives from the department's own methodology. Even before they relied on NSO or ILO 6A, which the department said is the same coverage, they relied on ILO 5B. Why wouldn't you just attack the labor rate and say the labor rate's too high, it ought to be reduced, instead of making an adjustment, which seems to me quite an odd adjustment, to simply exclude SG&A hours from the financial ratio. That was the department's decision. Not now. We're saying that they can't have it both ways, to apply a rate that's including SG&A and higher costs, but not adjust in the methodology. Yeah, but why isn't the solution to that to challenge the labor rate rather than to exclude hours from SG&A? I mean, why is that an appropriate adjustment to take account of the labor rate, which is too high? I don't get it. Well, we didn't appeal the labor rate originally, because that is what the department did in the final decision. They did apply this NSO labor rate, and they excluded SG&A costs from the ratios. So we had no issue with that. That's what the methodology seemed to say that went through notice and comment. That was the decision that the department determined was the best way to handle what they were concerned about at the time, which was that they were undervaluing labor. So instead they decided to use a labor rate that was much more encompassing, but they realized that to follow their normal policy of excluding anything in the financial ratios that's already in the labor rate, that they would then have to exclude more. I think the the part that we kept showing was the department said in their labor methodology that the department would, if the cost of labor is overstated, they would adjust the ratios. And then in the next sentence they elaborate on what that meant, and said specifically, when the surrogate financial statement includes disaggregated overhead selling general administrative expenses that are already included in the labor rate, then we're going to remove them. So it's not as though you got double counting of hours. It's just that your argument is the labor rate is too high, because it includes in the average SG&A hours, which are higher than production line labor. Yes. Right? And the department itself said that. So why don't you just attach the labor rate? Say the labor rate ought to be lower. Well we would, if the department... Why is the appropriate adjustment to exclude SG&A hours from the financial ratio? That doesn't make a lot of sense to me. If we were asking that the department follows the methodology it said, it decided it wanted, it went through notice and comment, and decided it wanted to use on a new labor, a new labor rate, and we weren't attacking that. We wanted them to use, follow the methodology that they said they were going to do. If the department now decides... You mean in labor methodology? That they were going to use a different... In the labor methodology. Right. Yeah, but that, but labor methodology resulted in a much higher hourly rate, did it not? Yes. Then they ultimately used under the NSO data. No, that was, the court got that wrong at the time. I doubt that before the court. That the ILO 6A labor rate that the judge was looking at was not, was an invalidated labor rate. The ILO removed it from the web page and said that was incorrect. Is that the 141 bot rate? The highest labor rate on the record. Was that, is that when you're referring that you're talking about the 141 bot rate? Yes, let me see. The highest labor rate on the record is the NSO labor rate that they relied on, ultimately. There we go. Page 867 of the appendix. 63 bot per hour is what the department relied on, and the 140 and 120 that were higher were the ones the department, the court did not understand that those were invalidated and removed from the web page. So the rate that was relied on... I'm getting a little confused. I understand the 63 bot figure, which is what they ultimately used, but I thought under the the 6A data, which they didn't use in this proceeding, that the labor rate was 141. Am I wrong about that? No, but that labor rate was an incorrect labor rate. ILO removed it from their web page and said that was wrong, and so the court should not have ever looked at it. What is the labor rate for 6A? We don't know, because they removed that from the record. Okay, so we don't really know. We don't know what 6A would have been. We know what 5B was, and we also know as we cited in our brief, that there is a large variety of labor rates amongst, from the people packing and doing day labor up to the managerial staff, but there's a large range of costs within that, and so all of that's being included in this cost, and so it's artificially high because of that, and the department didn't properly adjust according to their own methodology. We were asking that they follow what they said they would do, which comes in line with what they said they would do, and we don't know what the correct labor rate is under 6A, so... That was not a decision that needed to be known. Well, what you're arguing is it was arbitrary for them to make an adjustment when they used the 6A data, but not to make the same adjustment when they used the NSO data, correct? No. No? The 6A was not, the department decided to use NSO and said it was covered the same thing, and we don't know what the 6A would have been because it was incorrect on our record. Then you're not arguing that their approach here was a departure from the labor methodology document without explanation? No, we are saying that they're departing from the labor methodology, but the issue was never between 6A and NSO. It's saying this was all new. The labor methodology used 6A, right? Right, but the department also... And here they used NSO. Yes, but they didn't make a distinction. The department agreed that NSO and ILO 6A have the exact same coverage, so that was never the issue. It was never that now that we're using NSO... But they chose the NSO data as preferable to the 6A data. Because it was more contemporaneous. And more specific. No, said it was more contemporaneous. But they said both. Well, we don't know what the ILO 6A was, and that was not a part of their decision. I'm not sure that's right, but go ahead. Okay. Please, the court would like to discuss the steel values. If that's continued, we can continue to address labor. The department determines that the Thai import values for steel were the best available information, despite the fact that it was an uncommercial small quantity. It was aberrantly high on the record, and the import value was going into a country where 93% of the imports were dumped, and the domestic market for steel coil was also subsidized. And there were also additional allegations by the USTO that customs values are being manipulated going into this country. So all of these issues together were undermining the fact that the Thai steel value was the best available information, as opposed to the alternatives of Indonesia and the Philippines. So looking first at quantity, in seeking to properly determine cost to commercial respondents, the courts have upheld that import statistics can only be the basis for a surrogate value if they're commercially significant. The value that the department relied on was based on 374,000 kilograms. In contrast, Dong Wan purchased 2 million kilograms during that same period. The other mandatory respondent also had a similar amount, and those were only two producers of sinks going into this country. And it became more obvious when you looked at the data in more detail. And I would direct the court to page 7 of our reply brief, where we included a chart detailing exactly what was contained within these import statistics. So there were four HGS, 11-digit HGS, and these include the monthly totals by country going into this. And the vast majority of these quantities are less than a container, which is another form of what would be considered commercial. So you would say that when you have imports of a few thousand or a few hundred per country, only totaling 374,000 in total, in contrast to these great commercial producers and how much they're using and purchasing, this can't be considered a commercial quantity. And this chart also undermines the government's argument that the specificity of these Thai import values is what is making them so important. As you'll note, and we've highlighted in red, 78% of the quantity of these surrogate values came under one of these HGS. So there, I see I'm already moving into my rebuttal time. With all the questions, I just want to point out with that the department considered the fact that these aren't specific enough. They're overly specific at this point because we're only using one HGS. And that this court also considered this small quantity is tied with this high aberrancy. On page 28 of our brief, we compared the average unit value with all of the other countries, also showing this is the highest unit value on the record. And then in light of all of that, this was also an import based into a market overwhelmed by dumped imports and a 33% of the imports were dumped. So this value is 7% of the imports. It's necessarily going to be tainted and impacted by the market it's going into and all of the other imports that are dumped. This value can't be shielded when there's only 7% left from being impacted by this market. And that's also akin to the department's analysis they make in countervailing cases. That when a large part of the industry is impacted by subsidization or government control, that the whole market is going to be impacted by those prices. And then lastly, we would ask this court to look at... Were these other excluded imports, did they all point in the same direction or did they, would some of them have tended to suggest a higher price and some of them a lower price for the ones that weren't themselves tainted? I thought that they kind of pulled in opposite directions. Well the price went from 360 to 380. We would say that it's harder to determine when it's a dumped price because Thailand is putting a tariff on top of that price when it's coming in and it just, whether it's impacting it up or down, it's the fact that it's impacting it. The department, when they make this analysis in countervailing cases, doesn't determine is this making the benchmark price higher or lower. They only look at whether this is impacting the price. It's not making it a market economy price. It's making it a subsidized price or a government controlled price. So it's unreliable. And we're asking them to consider this as well in a unique case where 93% of the imports are being dumped. That the other seven are going to be impacted by that and not a reliable surrogate. And that this is also corroborated by issues that the USTR raised that the import values are also being manipulated. Given the time, I will remain those things for rebuttal. If the court doesn't have other questions. Thank you, Mr. Schroeder. May it please the court. The two issues are the stainless steel coil and the labor rates. Commerce in both cases select the most specific information on compute values. With respect to the stainless steel coil, commerce reasonably selected the most product-specific information available from any of the countries over a basket category. And obviously when you're trying to value something, you want to get as close to that product as possible. This is what essentially Don Young is attempting to second-guess commerce's reasonable judgment call. I don't understand why commerce in the first place has proposed to make the adjustment. It makes no sense to me. It's not eliminating double counting. It's not as though the labor hours are counted twice. It's that by including the SG&A labor rates in the total computation of labor rates over the total computation of the labor rate. So why wouldn't you just adjust the labor rate instead of taking SG&A hours out of the financial ratio. Yes, well, your honor, I believe you've defined correctly the issue. So and just to point out that Don Young is the company that proposed using the NSO rates that they ultimately use. Commerce erroneously, as pointed out by Chief Judge Stansu, the first time around, thought that there was double counting because the rates included both production or manufacturing and non-manufacturing labor. The problem is the hours themselves, and I believe you may have pointed that out, there were no... They don't double count. The hours aren't double counted. It's just the argument is that the labor rate is too high because it is a production line labor rates, right? Well, that's what they could have argued. In their reply, they've said, toward the end of their reply, that they're not asking that an adjustment be made. What they want is to eliminate what they call double counting. However, the problem is whatever the rate is, if you have zero hours of non-production labor, then you multiply the rate by... There's nothing to multiply it as far as non-production or manufacturing goes, so you can't assume there's double counting there. And what Judge Stansu pointed out is... There's nothing wrong with the financial ratio calculation according to that, right? I don't believe there's any dispute as to the financial ratio calculation. They're just saying that the labor rate is too high. That's... What they're arguing is that the financial ratios double count what is already in the factor of production on the other side, but we disagree and Commerce, the first time around, thought that was eliminated double counting. Judge Stansu pointed out some flaws and Commerce reasonably took another look at it on remand. But part of the problem is that Commerce is itself responsible for this aberrant approach because that's what you proposed in labor methodology when you were using the 6A data, right? Well, I believe Commerce, though, doesn't have to be bound to follow the exact methodology in the 6A data because what it found was that we have more specific information and we're not tied to having to use 6A. Commerce said we can use this better information because it's under a duty to use the best information available on the record. And so it departed from its methodology, explained why it was doing so, and that's all that's required of Commerce. Its methodology was reasonable and there wasn't sufficient evidence in the administrative record for Commerce to conclude that there was double counting, let alone the extent of it. And it's not double counting. It's making one adjustment to take care of an error that exists somewhere else. It's making an adjustment to data which no one is challenging. It's being inaccurate as a way of dealing with an inaccuracy in some other piece of data. I don't understand that approach, but there it is. Well, just to conclude, the appellant wishes to throw out the entire SG&A calculation in the financial ratio, but again, there's not substantial evidence of record that would justify them doing that, and they haven't asked that there be an adjustment. That's not the relief that they state in their reply brief. So we ask on both issues that the court sustain, affirm the decision of Chief Judge Stansu. Okay. Thank you. Thank you. Mr. Kello? I have nothing to add to the counsel for the government. Sorry. Okay. Thank you. Ms. Altman? It doesn't arise from the Court of Appeals. Thank you. As this Court, in discussing the labor methodology, has discussed that there may be issues with the logic behind what the department has suggested they do, they decided to change their labor methodology to change the labor source. And the department said that they would follow what they've been doing with 5B, which was to remove anything covered by 5B from the financial ratios. And they said that they would be doing the same thing using this different labor rate. And whether that makes sense or not to accommodate and adjust for labor, that's what the department said they were going to do. And that went through notice and comment, and people commented on it, and were asking that the department follow what they said they were going to do. In the labor methodology. Yes, we have an overstated labor rate. And if that's not going to be removed from the financial statements the way that they always did with 5B, when those itemized costs were the same as 5B, 6A... Why don't you just challenge the labor rate? I mean, there is data that would enable you to do that. We can do that in the future. But we were okay with this when the department was adjusting the ratios, and then they changed their mind about it. And when something went through notice and comment, that seems to be a very difficult thing to challenge. So instead of challenging that labor rate, we wanted the department to follow that labor rate. That labor methodology, I mean. Forgive me. And that's what we asked the department to do. And so, yes, if we want to challenge their selection of 6A, that's something to do in notice and comment. And a new labor methodology, not in this court case. Because 6A and NSO are the same. According to the department. That was not the issue here. It was the labor methodology. And again, I just want to conclude that, especially looking at the stainless steel coil, which was the main part of our margin. That's what drove this margin. That you're looking at the smallest quantity on the record with the highest value on the record into a market that the domestic producer was fully subsidized. Well, the domestic market was subsidized. And the imports were 93% dumped. And there were allegations by customs that customs was manipulating the values. Again, directly to those USTR reports. I don't remember. You presumably said in your brief, what is the alternative that you think is clearly better? Clearly better. Indonesia or the Philippines were the two values that we argued. One, almost 3 million kilograms imported. And the other, exceeding 9 million. Was that of a basket product? It was the larger HTS. So it does not include the specificity. It was a six-digit level. It didn't include the specificity on the surface. So basically, as I understand it, Commerce said, we will give greater weight to specificity than anything else. And that's what you're saying. They can't do that. We're saying this isn't a case where you have two similarly situated import values and one is more specific. The Thai value should be considered unreliable because it doesn't fulfill. It's too small of a quantity. It's too high and aberrant of an import value. And you have serious issues of it being subsidized or somehow tainted by this market that is highly subsidized and full of dumped steel. And further, the USTR allegations that there's issues with the actual recorded values of the imports themselves. But that can't be the best available information. Specificity can't overcome an unreliable import value. You have alternatives on the record. Okay. Thank you. Thank you. Thank you all, counsel. The case is submitted.